# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 12, 2013

## IN RE WESLEY S.

**Appeal from the Juvenile Court for Knox County**
**No. 13273    Timothy Irwin, Judge**

**No. E2012-02433-COA-R3-PT - Filed April 9, 2013**

This is a termination of parental rights case focusing on Wesley S. ("the Child"), the minor child of Wesley K.S. ("Father") and Kari F. ("Mother").  The parents were runaway teenagers when the Child was born in August 2007.  Father was incarcerated several times during the Child's first two years.  Father's latest incarceration began on May 14, 2009, and he has been in jail continuously since that date. The Child was taken into custody by the Tennessee Department of Children's Services ("DCS") on December 17, 2010.  On May 31, 2012, DCS filed a petition to terminate the parental rights of Father.  The sole ground alleged was abandonment, based on his conduct prior to incarceration exhibiting a wanton disregard for the welfare of the Child.  Following a bench trial, the trial court granted the petition upon its finding, by clear and convincing evidence, that Father had abandoned the Child due to his pre-incarceration conduct.  The court further found, by clear and convincing evidence, that termination was in the Child's best interest.  Father has appealed.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Robin P. Gunn, Knoxville, Tennessee, for the appellant, Wesley K.S.

Robert E. Cooper, Jr., Attorney General and Reporter, and Derek C. Jumper, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. Factual and Procedural Background

Mother and Father were ages seventeen and nineteen respectively when the Child was born on August 15, 2007. Because Mother had been placed in DCS protective custody at the time, both parents were "on the run," staying with various friends and relatives. Father admitted at trial that each parent had used illegal drugs before, during and after Mother's pregnancy. Father also testified that after the Child was born, the couple began residing with Mother's brother. Father attempted to work and financially support the family.

On December 13, 2007, when the Child was approximately four months old, Father was arrested for acting as a "lookout" while two other individuals rummaged through a vehicle. Father subsequently pled guilty to facilitation of burglary and was released the same day. On January 2, 2008, Father was arrested for burglary when he attempted to pawn tools he had stolen from another's vehicle. Father subsequently pled guilty to theft and spent approximately one week in jail. Following his release, he was placed on probation.

On March 25, 2008, and again on April 16, 2008, Father stole gasoline by driving away without paying. He pled guilty to theft and returned to jail on April 20, 2008. Father remained incarcerated until January 24, 2009. He then served several days in the Blount County jail for a driving-related charge. Less than one month later, on February 12, 2009, Father broke into the home of a female friend and assaulted her. On May 11, 2009, Father entered the home of Mr. Roger Noe and assaulted him, removing cash from his pocket. Father was arrested for these crimes on May 14, 2009, and has been incarcerated since that date. On June 2, 2009, Father pled guilty to two counts of aggravated burglary, one count of aggravated robbery, and one count of assault. All combined, Father received an eight-year sentence.

The Child was found to be dependent and neglected by Order of the Knox County Juvenile Court on December 20, 2010. He thereupon was placed in the protective custody of DCS. The Child has been in foster care continuously since that date. On May 31, 2012, DCS filed a petition to terminate the parental rights of Father.[1] The only ground alleged was abandonment, with DCS claiming that Father's conduct prior to incarceration exhibited a wanton disregard for the welfare of the Child. Following a bench trial, the trial court granted the petition upon finding, by clear and convincing evidence, that Father had abandoned the Child due to his pre-incarceration conduct. The court further found, by clear and convincing

---

[1] That petition stated that termination of Mother's parental rights was being sought through independent legal proceedings.

evidence, that termination of his parental rights was in the Child's best interest. Father filed a timely notice of appeal.

## II. Issues Presented

Father presents the following two issues for our review:

1. Whether the trial court properly concluded that Father, prior to his incarceration, engaged in conduct that exhibited a wanton disregard for the welfare of the Child.

2. Whether the trial court properly concluded by clear and convincing evidence that it was in the best interest of the Child to terminate Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal, and shall not be disturbed absent clear and convincing evidence to the contrary. *See McCaleb v. Saturn Corp.,* 910 S.W.2d 412 (Tenn. 1995).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the

elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (In re N.B.), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Wanton Disregard

Father argues that the trial court erred in holding that his pre-incarceration conduct exhibited a wanton disregard for the welfare of the Child. He asserts that his conduct prior to incarceration did not rise to the level of the wanton disregard standard. Father also contends that it is significant that he never involved the Child in any of his criminal endeavors.

The trial court terminated Father's parental rights on the statutory ground that he abandoned the child. Tennessee Code Annotated § 36-1-113(g)(1)(Supp. 2012) provides, as relevant to this action, as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

   (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A)(iv) (2010) defines abandonment, in relevant part, as:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child . . . and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . .

(emphasis added). Regarding the ground of abandonment by wanton disregard, the statute does not limit the parent's conduct to any particular four-month period prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005).

The referenced statute does not define "wanton disregard." We have previously explained the purpose behind this statutory section, however, as follows:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d at 866 (citations omitted).

On October 25, 2012, the trial court entered its Termination of Parental Rights and Final Decree of Guardianship, finding in pertinent part, *inter alia*:

> 1. When this child was born, his mother was a runaway from the custody of the Department of Children's

Services. She had turned seventeen just one week before. Respondent was nineteen. He had also been in the custody of the Department of Children's Services prior to turning eighteen. They had been dating since she was fifteen and had been on the run during much of this time. The teenagers sought shelter with various friends and relatives in Tennessee and in Michigan.

2. The child's mother had only three prenatal visits and was using drugs throughout this pregnancy. Respondent was aware of her drug use and was using with her. He was present when the child was born and assumed responsibility for mother and child. They lived together with her adult brother while Respondent worked to support his family.

3. On December 13, 2007, when the child was four months old, Respondent served as a lookout while two others searched through a victim's car. He was arrested and released the same day. Less than one month later, on January 2, 2008, he burglarized a vehicle, breaking out the rear window and taking tools which he subsequently attempted to pawn. He remained in jail that time for a little more than a week. On January 11, 2008, he entered a guilty plea to the charge of misdemeanor theft, was sentenced to "11/29" and released on probation. [Knox County General Sessions Court, No. 820156]. On March 25, 2008, and again on April 16, 2008, Respondent committed theft by filling his gas tank and driving off without paying. He was located and taken into custody on April 20, 2008. On June 4, 2008, he entered a guilty plea to the charge of theft and was sentenced to time served. [Knox County General Sessions Court, No. 832804]. At the same time, probation was revoked on his prior sentence, he remained in the Knox County Detention Facility until January 24, 2009, when he was transferred briefly to Blount County jail on a driving violation.

4. On February 12, 2009, Respondent broke into the home

of Melanie Wade, and assaulted her and another adult in the home. On May 11, 2009, he broke into the home of Roger Noe, beat him up and took cash from his pocket. He was arrested for those crimes on May 14, 2009. On June 2, 2009, Respondent entered guilty pleas to four criminal charges arising from those incidents. He received a sentence of eight years imprisonment for aggravated robbery and a sentence of three years imprisonment, to run concurrently, for aggravated burglary based on the events of May 11, 2009. [Knox County Criminal Court, Division I, No. 91740, counts 3 and 4]. He also received a sentence of three years imprisonment for aggravated burglary and a sentence of eleven months, twenty-nine days imprisonment for assault, to run concurrently with the previous sentences, based on the events of February 12, 2009. He has been incarcerated continuously since May 14, 2009.

5.      Respondent last saw this child prior to his imprisonment in June 2009, when the child was approximately 22 months old. He signed a Voluntary Acknowledgment of Paternity at the hospital and assumed responsibility for supporting his son, yet engaged in serious crimes carrying the likelihood of lengthy incarceration within months of the child's birth. Even after spending over nine months in jail, beginning when his son was eight months old, he returned almost immediately to a life of serious, violent crime. He admitted that he was an addict and that his drug use had contributed to his behavior. The child is now just over five years old. Due to his criminal conduct, Respondent has been incarcerated for all but approximately ten months of the child's life.

7.[2]     Upon those facts, the Court finds that Respondent is currently incarcerated and that prior to his incarceration, Respondent engaged in conduct which exhibits a wanton disregard for the welfare of the child.

---

[2] We have maintained the same numbering of paragraphs as reflected by the Trial Court's Final Decree.

Tennessee Courts have recognized in numerous cases that a parent's drug abuse and criminal activity can constitute a wanton disregard for the welfare of the child. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006); *In re Audrey S.*, 182 S.W.3d at 867-68; *In re Daysia D.*, M2012-00608-COA-R3-PT, 2012 WL 4503202 at *2 (Tenn. Ct. App. Sep. 28, 2012). For example, in *Daysia,* the mother was convicted of selling drugs within a school zone. *Id.* at *3. Mother admitted at trial that she also smoked marijuana at home while the children were present, but in a different room. *Id.* This Court found that such behavior constituted a wanton disregard for the children's welfare. *Id.*

Similarly, in the case of *In re Chyna L.M.D.*, E2012-00661-COA-R3-PT, 2012 WL 3776699 at *1 (Tenn. Ct. App. Aug. 31, 2012), the father was on probation when the child was conceived. He subsequently violated his probation by failing to appear for court and testing positive for drugs. *Id.* The father was offered the opportunity to participate in a program called "Community Alternatives to Prison Program" or "CAPP," which would allow him to complete his sentence in a halfway house and remain in the community with his girlfriend and child. *Id.* When the father appeared in court for a hearing, however, he behaved in such a manner that the "CAPP" offer of enhanced probation was withdrawn. *Id.* Consequently, the father's probation was revoked and he was returned to prison. *Id.* This Court found that such conduct was sufficient to establish that the father exhibited a wanton disregard for the welfare of his unborn child. *Id.* at *5.

In the case at bar, Father was arrested in December 2007 regarding the first of a string of criminal charges. The Child was then four months old. His arrest less than a month later resulted in Father spending a week in jail and being placed on probation. Again, Father was arrested on April 20, 2008, following two additional theft charges. Father pled guilty to these charges and returned to jail, where he remained until January 24, 2009. Less than a month after being released, he committed another crime by breaking into a friend's home and assaulting her. Three months later, Father entered Mr. Noe's home, assaulting and robbing him. Father subsequently was arrested and convicted. He received an eight-year sentence of confinement. All of this criminal behavior occurred before the Child was two years of age.

Father admitted that he was responsible for taking care of the Child and Mother during the time he embarked upon this crime spree. He testified that he was addicted to drugs, and that he and Mother were both using drugs. Father also stated that he and Mother used drugs together before the Child was conceived and during Mother's pregnancy. As the trial court found, despite having spent several months in jail during the Child's first year, Father committed another crime within one month of being released from custody.

As supported by the record in this cause, Father's criminal activity increased in

severity over time. In a previous action addressing a father's abandonment by wanton disregard, this Court found it significant that "after Father was aware he had the Child to consider, the seriousness of his criminal conduct only escalated." *In re Johnny J.E.M.*, E2011-02192-COA-R3-PT, 2012 WL 1929802 at *14 (Tenn. Ct. App. May 29, 2012). In the present action, Father first served as a "lookout" while others burglarized a vehicle. He later burglarized a vehicle himself and stole gasoline from business establishments. After his release following a nine-month prison sentence, Father soon committed another crime, which proved more serious in nature. Father continued his criminal activities approximately three months later. Consequently, he was given an eight-year sentence. Father remained incarcerated at the time of trial.

We conclude that Father clearly engaged in conduct prior to his incarceration that exhibited a wanton disregard for the welfare of the Child. Father knew he was responsible for the welfare of the Child but failed to take such into consideration. He instead chose to embark upon a course of continuing criminal activity. The evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Father "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Father further argues that it is significant that he never involved the Child in any of his criminal behavior. The crimes that lead to a parent's incarceration are not the only conduct the court may consider in its determination of wanton disregard. Rather, the court may consider conduct such as "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child." *In re D.M.*, M2009-00340-COA-R3-PT, 2009 WL 2461199 at *4 (Tenn. Ct. App. Aug. 12, 2009). We hold that the trial court did not err in terminating Father's parental rights on this ground. *See, e.g., In re Johnny J.E.M.*, 2012 WL 1929802 at *13-14.

## V. Best Interest of Child

Finally, Father contends that DCS failed to show, by clear and convincing evidence, that termination of his parental rights was in the Child's best interest. When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the Child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 877.

Tennessee Code Annotated § 36-1-113(i) (Supp. 2012) provides a list of factors the

trial court is to consider when determining if termination is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In the instant action, the trial court considered the above factors, making the following relevant findings:

1. Respondent testified that he has completed multiple programs and courses during his confinement, including obtaining his GED and passing two college-level classes through U.T. Martin. He has been sober for more than three years. He anticipates "without a doubt" that he will be released when he comes up for parole again in May 2013. At that point he plans to return to his mother's home. His counsel argued that he wants the opportunity to meet his son again and that there would be no harm from further delay as the child is in a safe placement. Due to his own conduct, Respondent has not been able to maintain regular visitation or other contact with the child and no relationship at all has otherwise been established between Respondent and the child. The Court applauds Respondent's exemplary records while incarcerated. He has obviously used his time well. But whether he has actually made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in his home simply cannot be determined. He currently has no home. He says he has changed his life, he says he will be released next May, he says he will then be a law-abiding citizen with a suitable home and a job, but right now that is all speculation. Asking this child to wait on that possibility is not in his best interest. The child is in a wonderful foster home where he has the opportunity to achieve permanency through adoption and be raised with his younger half-

sister, with whom he is very bonded. The Court has observed the two children with their foster mother and noted their attachment to each other and to her. A change of caretakers and physical environment (including a separation from his half-sister) is likely to have a detrimental effect on the child's emotional and psychological well-being. Respondent is certainly an individual who has shown neglect toward this child and, through his drug use with the mother during her pregnancy, contributed to this child's long-term disadvantages. He engaged in criminal activity and substance abuse while claiming to be committed to the care of his son. And, finally, due to his incarceration he has been unable to provide any child support.

2. The child's mother has surrendered her parental rights.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

4. The child is entitled to a safe, secure and loving home and, as noted above, has found one with his current foster parents.

5. It is, therefore, in the best interest of [the Child] and the public that all of Respondent's parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place him for adoption and to consent to such adoption in loco parentis.

The evidence preponderates in favor of the trial court's factual findings. Father was not able to show that he had made an adjustment of circumstance such that it would be safe for the Child to be in his home. Father did testify that he had received his GED in jail, completed two college-level courses, a program that focused on life skills and substance abuse issues, and two anger resolution seminars. Father also indicated that he was eligible for parole in May 2013. He admitted, however, that he had been considered for parole twice before, but had not been released.

Father further indicated that he desired to get to know the Child and teach him to avoid a life of crime and drugs. However, Father also admitted that he knew little about the Child. Due to his incarceration, Father had not maintained contact, visited or provided support regarding the child. The proof established that at the time of trial there existed no meaningful relationship between Father and Child.

Both the foster mother and the guardian *ad litem* stated during trial that it would be devastating for the Child to be separated from his half-sister, because the children maintained such a close relationship. The guardian *ad litem* further testified that the Child was thriving in his foster home. The foster mother stated that she was prepared to adopt both children and provide a home for them together. Further, the trial court noted that it had observed both children with the foster mother, and that the children were obviously quite bonded to each other as well as with her.

The evidence further supports the trial court's determination that Father has shown neglect toward the Child. Father admitted that he and Mother were on the run when the Child was born, and that both were using drugs. Father testified that he was first arrested when the Child was about four months old. Father also admitted that he was guilty of all of the crimes for which he was charged. Due to his continuing criminal activity, Father's incarceration continued for all but approximately ten months of the Child's life.

From our examination of the record before us, we determine that there is clear and convincing evidence that termination of the Father's parental rights was in the Child's best interest.

## VI. Conclusion

The judgment of the trial court terminating the parental rights of Father is affirmed. Costs on appeal are taxed to appellant, Wesley K.S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

-13-